PER CURIAM.
¶1 Brian Wiemeri appeals a divorce judgment that terminated his marriage to Stacy Wiemeri. He argues the circuit court erred by: (1) denying rather than reserving him maintenance; and (2) reserving jurisdiction over the parties' property division. We conclude the court did not erroneously exercise its discretion by denying Brian maintenance, and we reject Brian's argument that the court reserved jurisdiction over the property division. We therefore affirm with respect to these issues.
¶2 Brian also argues that the circuit court erred when dividing the parties' property by awarding him a $100,000 retirement account that did not, in fact, exist. Stacy concedes that what the court characterized as a retirement account was actually deferred compensation from 2016 that Brian received in 2017. She argues, however, that the court could treat the deferred compensation as an asset for purposes of the property division and that it properly awarded that asset to Brian. We disagree. The court's oral ruling clearly shows that it mistakenly believed the deferred compensation was a retirement account. Moreover, even if the court understood that the deferred compensation was not a retirement account, the evidence in the record was insufficient to establish the value of the deferred compensation and what happened to those funds after Brian received them. We therefore reverse in part and remand for the circuit court to determine the value of the deferred compensation and, if possible, what happened to that money. The court must then reconsider the property division in light of that information.
BACKGROUND
¶3 Brian and Stacy were married in October 2001. Stacy petitioned for divorce in July 2017. At the time of filing, the parties had two minor children, ages thirteen and ten. Brian was forty-two, and Stacy was forty-one.
¶4 Brian was self-employed as an insurance broker for the entirety of the parties' marriage. He has a bachelor's degree in technology and is three credits shy of a master's degree in business administration. Stacy is a registered nurse. At the time of the parties' divorce, she was employed at Mayo Clinic and was working toward a master's degree in nursing in order to become a nurse practitioner.
¶5 It is undisputed that Brian is an alcoholic. At the parties' divorce trial in May 2018, Stacy testified that she and Brian's father had arranged an intervention in 2013, after which Brian was admitted to L.E. Phillips, a treatment center. Brian remained at L.E. Phillips for three days, but he started drinking again soon after he returned home. On April 17, 2018, less than one month before the divorce trial, Stacy and two of Brian's friends arranged an intervention, after which Brian was admitted to L.E. Phillips for an inpatient detoxification program. Thereafter, Brian was voluntarily admitted to an inpatient treatment program, and he remained in that program at the time of the divorce trial.
¶6 Before 2015, Brian had historically earned approximately $100,000 to $200,000 per year. Brian's tax returns showed that his gross income was $177,412 for the year 2013 and $205,860 for the year 2014. Brian testified at trial that his alcoholism began to have a negative effect on his earnings after the year 2014. Consistent with that testimony, Brian's 2015 tax return showed that his gross income that year decreased to $62,550.
¶7 Brian expressed optimism, however, about his future business prospects. He testified he had completed nineteen days of his twenty-eight-day treatment program and was currently in "minimal treatment status." He stated the program had helped him gain a better understanding of his alcohol addiction, and he had "no desire to ever take a drink ever again." He further testified that having completed the program, he would be reasonably capable of supporting himself following the parties' divorce. He asserted that despite his alcoholism, he still had a "book of business" consisting of about 2000 clients. He testified his struggle with alcoholism was not generally known in the community or among his clients.
¶8 Stacy testified at trial that her biggest concern about her financial situation was the amount of debt the parties had incurred, and particularly her uncertainty about how much debt Brian had incurred but not disclosed to her. She specifically testified that Brian had obtained a credit card and a vehicle title loan without her knowledge. She also testified that her paycheck was being garnished due to a judgment against both of them on another credit card debt. Stacy further testified Brian had "maxed out" the parties' home equity line of credit during their separation, in violation of an August 29, 2017 temporary order.
¶9 There was also evidence at trial that Brian had sold the parties' pontoon boat, which had a Kelley Blue Book value of $32,000, for $22,000 while the divorce was pending. That sale was also in violation of the temporary order, which prohibited the parties from disposing of their property. In addition, Brian admitted that during the pendency of the divorce proceedings, he had sent approximately $40,000 overseas in response to what turned out to be an internet scam promising a $2.8 million payout. There is no evidence that Brian recovered any portion of that amount.
¶10 The circuit court ultimately reserved maintenance to Stacy for nine years and denied maintenance to Brian. The court also ordered an unequal property division, explaining:
[T]he property statutes['] division of property and debts, there's a presumption of equal ... division of assets and equal division of debts. As you can see, I'm throwing that out the window. There is going to be no equal division of assets and no equal division of debts because, among other things, I can't figure out what the assets are. And I can't figure out what the debts are because the evidence shows that Brian may have assets he hasn't disclosed. Brian may have debts that he hasn't disclosed and those debts might come to roost on Stacy's doorstep. And so what I'm trying to do here is to, for me to protect both of them, but to protect Stacy from the unknown.
The court further explained that its unequal division of the parties' property included an unequal division of their "retirement accounts." Specifically, the court awarded Brian an "Allianz ... deferred compensation fund" with a value of "roughly $100,000," whereas Stacy received "all of her retirement accounts," which had a total value of $271,090.
¶11 When discussing the property division, the circuit court was clearly concerned that Brian had not disclosed all of his assets and debts. As such, the court stated during its oral ruling:
[Y]ou should put in the judgment, because I've never had a case like this where I've had to decide division of assets and debts where I'm not reasonably confident that all the assets and the debts have been disclosed. I want the judgment[ ] of divorce to note that if it should come to everybody's attention postdivorce that there have been assets not disclosed or debts not disclosed that come to roost on Stacy's door, that I think this would be an appropriate case to invoke the provisions of section 806.07(1).
That statutory section is entitled "Relief from Judgment or Order." And I could envision possibly, hopefully that won't happen, but I could envision circumstances that fit the subsections under 806.07(1),(b),(c), or (h). That would permit Stacy to reopen this asset and debt division if this becomes disadvantageous to her.
In accordance with the court's oral ruling, the final divorce judgment contained the following language:
Missing debts. If Stacy should find any missing debts or outstanding obligations that should have been disclosed by Brian, she may be entitled to relief under section 806.07 of the Wisconsin Statutes to reopen this divorce judgment and receive further input from this Court regarding those debts and financial obligations.
¶12 Brian now appeals, arguing the circuit court erred by: (1) denying him maintenance, rather than reserving maintenance; (2) reserving jurisdiction over the parties' property division; and (3) awarding him a $100,000 Allianz retirement account that did not actually exist.
STANDARDS OF REVIEW
¶13 The division of property and determination of maintenance at divorce are committed to the circuit court's discretion, and we will not reverse unless the court erroneously exercised its discretion. LeMere v. LeMere , 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789. A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a rational process to reach a reasonable conclusion. Id. We search the record for reasons to sustain a circuit court's discretionary decisions. State v. Thiel , 2004 WI App 225, ¶26, 277 Wis. 2d 698, 691 N.W.2d 388. In addition, we will not disturb any factual findings underlying a discretionary decision unless they are clearly erroneous. Covelli v. Covelli , 2006 WI App 121, ¶13, 293 Wis. 2d 707, 718 N.W.2d 260.
¶14 To determine whether the circuit court erred by reserving jurisdiction over the property division, we must interpret the court's oral ruling and written judgment. The interpretation of a divorce judgment presents a question of law that we review independently. Monicken v. Monicken , 226 Wis. 2d 119, 126, 593 N.W.2d 509 (Ct. App. 1999).
DISCUSSION
I. Denial of maintenance to Brian
¶15 An award of maintenance at divorce serves two objectives: (1) support of the payee spouse at a predivorce standard of living; and (2) fairness, "which aims to 'compensate the recipient spouse for contributions made to the marriage, give effect to the parties' financial arrangements, or prevent unjust enrichment of either party.' " McReath v. McReath , 2011 WI 66, ¶44, 335 Wis. 2d 643, 800 N.W.2d 399 (citation omitted). WISCONSIN STAT. § 767.56 (2017-18)[1] sets forth ten factors a court should consider when awarding maintenance. See § 767.56(1c). "In making a maintenance decision, the court is not obliged to consider all of the statutory factors, but must consider those factors that are relevant." Brin v. Brin , 2014 WI App 68, ¶11, 354 Wis. 2d 510, 849 N.W.2d 900.
¶16 In this case, the circuit court began its discussion of maintenance by acknowledging the dual support and fairness objectives of a maintenance award. The court then explained:
And there are a variety of things to take into account: Each one's contribution, if any, to the earning capacity of the other; whether one person spent more [time] providing childcare or the equivalent of childcare, didn't hear any evidence about that, so I can't take that into account; their lifestyle, I explored that, they didn't have any lavish lifestyles; and they both increased their earning capacities while they were married to-in one way, shape, or form, so that's a wash. So really the primary maintenance issue is the support factor.
¶17 The circuit court then announced that, in light of the support factor, it would "deny maintenance to Brian and withhold maintenance to Stacy for a period of nine years." The court explained that it was denying Brian maintenance because "but for his alcohol addiction, over which Stacy has no control and to which she didn't contribute anything, Brian's earning capacity would be unabated and would be, who knows, in the high 100,000s or maybe 200,000s." In contrast, the court noted that Stacy's earnings were "relatively fixed," and her earning capacity was "in the mid 50s." The court reasoned, "[Y]ou compare a mid 50s earnings to Brian who could be bringing in well over $100,000, that implicates the support factor." Given the parties' respective earning capacities, the court found that Brian "[did not] need maintenance" and, in any event, Stacy "[could not] afford to pay it."
¶18 As for its decision to reserve maintenance to Stacy for nine years, the circuit court noted that the parties had a seventeen-year marriage, and Stacy was forty-two years old at the time of the divorce trial. The court explained that in nine years the parties' younger child would be about twenty, and it is "common knowledge that parents in this day and age, even beyond the age of 18, pay for health insurance and pay for those sorts of things." The court also noted that nine years was "roughly half the period of time that the parties were married." The court stated it was not "unfair to Brian to face the prospect of having to pay maintenance" for a nine-year period "if, as we all hope, he overcomes his addiction and his earnings go back up."
¶19 In addition, the circuit court was clearly worried about the prospect that its decision would enable Brian's poor financial choices. In explaining why it had awarded the parties' home to Stacy, the court stated:
[T]he reason why I'm granting-why I'm awarding the entirety of the Sarona real estate [to Stacy] is that these parties really have to have their property separated. Stacy's never going to live there again. And Brian hopes on a wing and a prayer that he can stay there and support it, and to remortgage it, and get help from his parents. But reasonable inferences from the evidence lead me to conclude that that will never be done. It won't happen. There's no incentive for Brian to remortgage it because he has the best of both worlds right now. He's living there loose and fancy free, and as long as he's not forcibly removed, the status quo benefits him.
Another reason why I'm doing this is that really for Stacy's economic health and Brian's economic health, the place needs to be sold. That mortgage, that debt needs to be obliterated. Based upon the testimony that I heard from Brian-that's when I was asking questions about where he does his work or why he does his work-Brian doesn't need that home. It is nothing more than an emotional attachment for him. He can do his work out of a smaller home, out of a smaller apartment. Nobody needs it. Stacy doesn't need it; he doesn't need it.
Although the court made these comments in the context of the property division, they show the court was actively attempting to avoid enabling Brian's unrealistic view of his own financial situation.
¶20 On this record, the circuit court did not erroneously exercise its discretion by declining to award Brian maintenance. The court considered relevant statutory factors, including: (1) the length of the marriage, see WIS. STAT. § 767.56(1c)(a) ; (2) Stacy's age, and Brian's alcoholism, see § 767.56(1c)(b) ; (3) the parties' respective earning capacities, see § 767.56(1c)(e) ; (4) the feasibility that Brian-the party seeking maintenance-could become self-supporting, see § 767.56(1c)(f) ; (5) the parties' contributions to each other's increased earning capacities, see § 767.56(1c)(i) ; and (6) a desire to avoid enabling Brian's poor financial choices, see § 767.56(1c)(j). The court considered the fairness objective of maintenance but appropriately concluded that, under the circumstances, that factor did not strongly favor either party. The court therefore focused primarily on the support objective, finding that, given the parties' respective earning capacities, Brian did not need maintenance, and Stacy could not afford to pay it. The court examined the relevant facts, applied a proper standard of law, and used a rational process to reach a reasonable conclusion. LeMere , 262 Wis. 2d 426, ¶13. As such, we cannot conclude that the court erroneously exercised its discretion.
¶21 Brian argues that instead of denying him maintenance outright, the circuit court should have reserved maintenance to him, as it did for Stacy. He contends the court's finding that he did not need maintenance because he had previously earned approximately $100,000 to $200,000 per year was based on "impermissible speculation," because he "was [no longer] making those sums, had not for the last several years, and was actively in treatment for his disease" at the time of the divorce trial. Brian also observes that when discussing its ruling on child support, the court acknowledged that Brian's future earnings were "unknown and unknowable."
¶22 The circuit court's finding that Brian did not need maintenance is not clearly erroneous, as it is supported by Brian's own testimony at the divorce trial. Brian testified that his income only began to decrease as a result of his alcoholism after the year 2014. He asserted that despite his alcoholism, he still had a "book of business" consisting of about 2000 clients, and his alcoholism was not generally known among his clients or in the community. He also testified about the progress he had made in his inpatient treatment program and opined that, having completed that program, he would be reasonably capable of supporting himself following the parties' divorce. Based on this testimony, and the evidence about Brian's income prior to 2015, the court could reasonably find that Brian did not need maintenance. That the court elsewhere expressed uncertainty about Brian's future earning capacity does not render the court's finding about the need for maintenance clearly erroneous, as the future is, to some degree, inherently unknowable.
¶23 Brian also challenges the circuit court's factual finding that Stacy had an earning capacity in the "mid 50s"-specifically, $57,672 per year. He argues the court's calculation was based on an assumption that Stacy was paid twice a month, whereas Stacy actually testified that she was paid every two weeks. Based on that testimony, Brian's attorney argued in the circuit court that Stacy's income was $62,452 per year. Assuming without deciding that the circuit court erred in this regard, we conclude the error was harmless. See WIS. STAT. § 805.18. Regardless of whether Stacy's annual income was $62,452 or $57,672, the court properly found that Stacy's income was far less than what Brian had historically earned before his alcoholism began to affect his work. There is no indication that a difference in Stacy's income of less than $5000 per year would have affected the court's analysis. Moreover, while Brian asserts it "can be presumed" that Stacy's income will increase in the future as a result of her educational pursuits, he cites no evidence in support of that assertion.
¶24 Finally, Brian argues the circuit court's decision to deny him maintenance is inconsistent with Hacker v. Hacker , 2005 WI App 211, 287 Wis. 2d 180, 704 N.W.2d 371. However, Hacker is inapposite. In that case, the wife-Nancy-had earned $60,000 per year during the parties' marriage, and the husband-Jeffrey-had earned $144,000 per year. Id. , ¶3. In August 2002, about one year before the parties' divorce, Nancy's employment was terminated because of problems caused by her alcoholism. Id. At the time the divorce was finalized, Nancy was unemployed but was collecting $43,500 per year in disability benefits. Id. Those benefits ended in 2004, leaving Nancy with no income. Id.
¶25 The circuit court initially ordered Jeffrey to pay Nancy $46,500 per year in maintenance. Id. , ¶4. However, in September 2004, the court reduced Nancy's maintenance award to $6500 per year. Id. The court found that Nancy needed $5400 per month to live in a manner that would approximate her marital standard of living, and that Jeffrey was capable of paying that amount. Id. , ¶¶17, 19. Nonetheless, the court refused to award that amount of maintenance, reasoning that "such an award would be unfair because Nancy, not Jeffrey, should bear the burden of her alcoholism." Id. , ¶17.
¶26 Nancy appealed, raising a number of challenges to the circuit court's reduction of maintenance. Id. , ¶1. We reversed, on the ground that the reduced maintenance award "[did] not satisfy the support objective of maintenance." Id. We conceded the circuit court's desire to craft a maintenance award that was fair to Jeffrey was "understandable." Id. , ¶19. We stated, however, that Wisconsin law does not permit a court to order a maintenance award that satisfies one of the maintenance objectives "by entirely negating the other." Id. Based on the circuit court's own findings, we stated the effect of the reduced maintenance award was to "allow Jeffrey to maintain the standard of living that he enjoyed in marriage while radically reducing Nancy's." Id. We explained, "While circumstances must adjust to economic reality, a court should not 'reduce the recipient spouse to the subsistence level while the payor spouse preserves the pre-divorce standard of living.' " Id. , ¶13 (citation omitted).
¶27 In Hacker , the circuit court expressly found that: (1) Nancy needed $5400 per month to maintain her predivorce standard of living; and (2) Jeffrey could afford to pay that amount. Under those circumstances, we concluded the court had erred by awarding Nancy only $6500 per year based on the court's concern that a greater award would be unfair to Jeffrey. Here, in contrast, the circuit court expressly found that: (1) Brian did not need maintenance; and (2) Stacy could not afford to pay him maintenance. Given these factual findings, the court's decision to deny Brian maintenance did not impermissibly disregard the support objective in the same way that the circuit court's decision did in Hacker . Accordingly, Hacker does not compel a conclusion that the court erroneously exercised its discretion by denying Brian maintenance.
II. Reservation of jurisdiction over the property division
¶28 Brian also argues the circuit court erred by reserving jurisdiction over the division of the parties' property. He cites WIS. STAT. § 767.59(1c)(b), which states that a court "may not revise or modify ... a judgment or order with respect to final division of property."
¶29 Brian is correct that property division is not subject to a circuit court's continuing jurisdiction and may not be modified based on a change in circumstances. See Thorpe v. Thorpe , 123 Wis. 2d 424, 426, 367 N.W.2d 233 (Ct. App. 1985). However, it is well established that a court may grant relief from a judgment dividing property at divorce under WIS. STAT. § 806.07. See Thorpe , 123 Wis. 2d at 426. Here, the circuit court's oral ruling and written judgment merely informed the parties that if it later became apparent that Brian had failed to disclose relevant assets or debts, Stacy could seek relief from the property division under § 806.07. Contrary to Brian's assertion, the court did not attempt to reserve jurisdiction over the property division. It simply informed the parties of a statutory remedy that might be available if additional information came to light after the court entered its final judgment. Brian's argument that the court erred by reserving jurisdiction over the property division therefore fails.
III. Treatment of Brian's Allianz "retirement account"
¶30 Brian also argues that the circuit court erroneously exercised its discretion when dividing the parties' property by awarding him a $100,000 retirement account that did not actually exist. As noted above, the court ordered an unequal division of the parties' property. In its oral ruling, the court specifically addressed the division of the parties' "retirement accounts," stating:
According to the evidence, there are two different sets of retirement accounts. The Allianz ... deferred compensation fund has a value of roughly $100,000, that's awarded to Brian. And all of Stacy's are awarded to her. ... What this means is that in terms of retirement funds, Brian's only getting $100,000, whereas Stacy is getting $271,090.
The written divorce judgment ultimately stated:
RETIREMENT ACCOUNTS, INVESTMENT ACCOUNTS, AND COMPENSATION DEFERRED BY BRIAN. Brian shall be awarded any deferred income he has from insurance companies, including Allianz. Stacy shall be awarded her Wisconsin Retirement System ETF Fund, her WEA 403(b) fund, and the Allianz annuity in her name.
¶31 Brian asserts there was no evidence at trial to support the existence of an Allianz "retirement account." Indeed, Brian expressly testified at trial that he did not have any retirement accounts. Under the heading "Retirement Funds," Stacy's property division worksheet contained the notation "Allianz Deferred Compensation: 2016 deferred amount and mo [sic] ... $100,000.00." When questioned about that notation at trial, Brian explained that he had earned income from Allianz, an insurance company, in 2016, but he deferred his receipt of that income until 2017. Stacy similarly testified at trial that Brian had "deferred income" from Allianz during the year 2016.
¶32 On appeal, Stacy concedes that the circuit court erred by referring to Brian's deferred income from Allianz as a retirement account. However, Stacy argues Brian received that income during the marriage, and, as such, the income "was a marital asset subject to division under WIS. STAT. § 767.61(3)." She contends the court properly awarded "any and all deferred income from insurance companies, including Allianz, entirely to Brian." She further contends the court could reasonably accept her estimate of $100,000 as the value of the deferred income based on: (1) Brian's testimony that Allianz was his biggest source of income; (2) Brian's testimony that he received $100,000 to $200,000 from Allianz during some prior years; and (3) Brian's 2014 tax return, which confirmed that he received over $100,000 from Allianz that year. Stacy also argues that Brian, as the party who received the deferred compensation, was responsible for producing evidence regarding the amount of the compensation and what happened to those funds. Absent such information, Stacy argues the court could properly award the entire $100,000 payment to Brian in the property division.
¶33 We disagree. First, the circuit court clearly committed an erroneous exercise of discretion when it treated whatever deferred income Brian received in 2017 as a retirement account. Second, even if the court understood the true nature of the deferred income, there was no evidence in the record as to what happened to that income after Brian received it. The income could, for instance, have been used to meet living expenses of the parties or included in a bank account that the court considered elsewhere in the property division. Third, there was insufficient evidence in the record for the court to ascribe a value of $100,000 to the deferred income. Brian's 2017 tax return shows that Brian's gross business receipts for that year were $83,174. Thus, any Allianz income from 2016 that Brian deferred until 2017 must have been less than that amount.
¶34 Ultimately, if Stacy wanted Brian's deferred compensation from Allianz to be included as a separate asset in the property division, it was incumbent upon her to establish its existence and value. She failed to do so. We therefore reverse the circuit court's division of the parties' property. We remand for the court to determine the value of the deferred compensation Brian received from Allianz in 2017 and, if possible, what happened to those funds. The court must then reconsider the property division in light of that information.
¶35 No WIS. STAT. RULE 809.25(1) costs are awarded to either party.
By the Court. -Judgment affirmed in part; reversed in part and cause remanded with directions.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.